**AGNEW et al. v. AMERICAN PRESIDENT LINES, LIMITED, et al.**

No. 11943.

United States Court of Appeals
Ninth Circuit.

May 5, 1949.

As Amended May 6 and 18 and Sept. 9, 1949.

Albert Michelson, San Francisco, Cal., for appellants.

Lillick, Geary, Olson, Adams & Charles, Ira S. Lillick, and James L. Adams, San Francisco, Cal., for appellees.

Before DENMAN, Chief Judge, and STEPHENS and ORR, Circuit Judges.

DENMAN, Chief Judge.

This is an appeal from a decree denying to appellants, unlicensed sailors on the Steamer President Harrison, an emergency wage increase and maintenance while interned by the Japanese for some three years and nine months, until August 15, 1945, after the Japanese capture, on December 8, 1941, of the steamer in the waters off the

coast of China, they having traveled on her from San Francisco to Manila and from there to the Chinese waters.[1] The court awarded the emergency wage increase only for the period the sailors were carried on a different vessel as repatriates from their place of internment, east bound on the Pacific Ocean to the 180th Meridian.

The district court in denying the emergency wage increase during internment held that under the shipping articles the sailors were entitled to the war bonus only when on some ship navigating on the voyages easterly and westerly in the Pacific west of the 180th Meridian. The appellants contend here that the district court erred (A) in refusing to hold the war bonus is due for the period of their internment in Japan and (B) in refusing them maintenance during internment.

*A. The War Bonus to the Unlicensed Sailors While Interned by the Japanese.*

█ In construing the shipping articles, it is not questioned that the following are controlling: First, that Sec. 676, 46 U.S.C., 46 U.S.C.A. § 676, provides that the shipping articles "shall be deemed to contain all the conditions of contract with the crew as to their services, pay, voyage and all other things." Second, because the riders were prepared by, they must be construed most strongly against appellees, and third, that the riders' provisions must be interpreted liberally in favor of the seamen in line with the traditional solicitude of the courts of admiralty for their physical and economic well being. Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239.

The shipping articles' agreement is contained in a rider thereto of which the parties stipulate that the words "emergency wage increase" are synonymous with "war bonus." The rider reads:

"Rider for Passenger & Freight Vessels in the Trans-Pacific & Straits Settlements Service

"1. The American President Lines agree to pay an [war] emergency wage increase to the unlicensed crew of the SS PRESI-DENT HARRISON, Voyage 55.

"2. The monthly basic wages as shown in the following agreements between the Pacific American Shipowners Association and the Unions are to be used as the basis for payment of this increase:

| | |
|---|---|
| Sailors' Union of the Pacific | Effective October 10, 1939 |
| Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association | " October 1, 1941 |
| Marine Cooks and Stewards' Assn of the Pacific Coast | " July 5, 1940 |

"3. To all employees entitled to receive basic wages of $120.00 per month or less under said Agreement, the sum of $80.00 per month.

"4. To all employees entitled to receive in excess of $120.00 per month under said agreement, 66⅔% of such basic monthly wage.

"5. This emergency wage increase to apply from the crossing of the 180th Meridian westbound until crossing the 180th Meridian eastbound.

"6. In the event the vessel is interned, destroyed or abandoned as a result of war operations and is unable to continue her voyage, basic wages and emergency wages specified in the collective bargaining agreement between the Pacific American Shipowners Association and the Unions shown above shall be paid to the date the members of the crew arrive in a Continental United States port and the employees shall be repatriated to a Continental United States port. War bonuses at the rates specified in paragraphs 3 and 4 hereof shall be paid while employees are in the war zones defined herein."

The first disputed question here is whether, the vessel having been interned within paragraph 6, the sailors there detained were within "the war zones defined herein" of its last sentence, at the time of the capture and thereafter during their internment.

---

[1] The shipowner paid basic and emergency wages for the entire period of the internment of the sailors and of the repatriation. The emergency increase wages or war bonus was paid by it only from the vessel's crossing of the 180th Meridian to her capture.

The district court reached its conclusion denying the war bonus during internment by holding that no war zone of the last sentence in paragraph 6 was "defined" in the rider, and a supplemental war zone rules agreement, and hence it could determine the sailors' contract with the owner by evidence dehors the rider and agreement.

■ We do not agree. We think that the sailor employees on a voyage from Manila to the China Coast (west of the 180th Meridian) were, when interned in Shanghai within the war zone defined in the rider. It is a reasonable interpretation of paragraph 6 that it provides that the basic wage and emergency wage, (but not the war bonus or emergency wage increase,) are to be paid while the employees are *both* west and east of the 180th Meridian, while the additional war bonus is to be paid only while west of that Meridian. We think that paragraph 5 should be construed, in connection with paragraphs 3, 4 and 6, as reading:

"5. This [war bonus or] emergency wage increase [payable to the sailors under paragraphs 3 and 4] to apply [in the war zone existing] from the [sailors'] crossing of the 180th Meridian westbound until [their] crossing the 180th Meridian eastbound."

It is a rational interpretation, in favor of the sailors, of paragraph 5 of the rider, drawn by the shipowner, to say that the area in which a *war* bonus is to be paid is a *war* zone. Such an interpretation gives effect to the rider's provisions instead of making nugatory the last sentence of paragraph 6 by holding that no war zone is described in the rider.

That the sailors were captured and held in a war zone is further shown in the supplemental agreement with the sailors clarifying paragraph 5 of the rider, as follows:

"1. The following war bonus rules shall govern the parties hereto—

"(a) There shall be five war zones; namely:

＊ ＊ ＊ ＊ ＊ ＊

"III. Trans-Pacific voyages to Japan, Philippine Islands, China, Indo-China, East Indies, Malayan Peninsula. (After cross-ing the 180th Meridian westbound, until recrossing the same Meridian eastbound.)"

It is a rational interpretation to regard the men, the vessel and the voyage as *not* the *war zone*. Rather each of the three is *in* the war zone. The men remained employees in the zone during the internment, expressly a contemplated incident of the employment contract.

The war bonus rules concern the employees who are to receive it. Hence 1(a) III, construed in connection with paragraph 6 of the rider, rationally should be read as

"III. [For employees on] Trans-Pacific voyages to Japan, Philippine Islands, China, Indo-China, East Indies, Malayan Peninsula. [the war zone is] (After [the employees] crossing the 180th Meridian westbound, until [their] recrossing the same Meridian eastbound.)"

Appellees assert that we have held to the contrary in Steeves v. American Mail Line, 9 Cir., 154 F.2d 24. There is no merit in this assertion. The rider there was so essentially different that we thought that case inapplicable. It provided,

"The American Mail Line agrees to pay an emergency war bonus to the crew of the S.S. Capillo, Voyage Six (6), in accordance with the provisions contained *in the applicable supplementary agreements in effect* between the Pacific American Shipowners' Association and the various Marine Unions.

"In the event the vessel *and/or crew be* interned, *imprisoned, hospitalized or put ashore due to war causes* and for that reason, be unable to continue their voyage, the company agrees to pay wages and bonus to the date members of the crew arrive in an United States port, on the Pacific Coast; furthermore, the company agrees, in such event, to arrange for repatriation of such men to a United States port on the Pacific Coast. ＊ ＊ ＊" (Emphasis supplied.)

The first paragraph does not appear in the riders of the three instant appeals nor do the italicized words "and/or crew be imprisoned, hospitalized or put ashore." We held that this second paragraph determined the liability for the war bonus and hence that the supplemental agreements mentioned in the first paragraph were inapplicable

even if providing differently. As appellants' petition for rehearing states, "this court did not have occasion to construe the supplementary bonus agreement affecting licensed personnel in The Capillo [Steeves] decision."

In the instant case the second paragraph omitted the above italicized words but had added to it the sentence, "War bonuses at the rates specified in paragraphs 3 and 4 hereof shall be paid while employees are in the war zone defined *herein.*" (Emphasis supplied.) Even if it were true that dicta in the Steeves case are construable adversely to our conclusions here, they are of no effect in these three appeals involving other seamen and owners on different issues on differing agreements.

■ Appellees contend as they did in the Steeves case that an agreement between appellants' unions and the American President Lines made on February 21, 1942, that is two and a half months after the capture of the appellants, retroactively wiped out the provisions of the articles' rider which, as we hold, gave them the right to the war bonus during their captivity. For the reasons stated in Steeves v. American Mail Line, supra, 154 F.2d page 26, we find no merit in this contention.

We hold the decree should be reversed as to its denial of the war bonus during internment.

B. *Maintenance of Sailors after Internment.*

Appellants claim that after the shipowner lost its vessel, here by capture, there is under the general maritime law an implied contract to pay her sailors maintenance thereafter. No authority is cited for such a proposition and the contrary inference is to be drawn from Alaska S.S. Co. v. United States, 290 U.S. 256, 262, 54 S.Ct. 159, 78 L.Ed. 302.

It is true that a sailor sustaining bodily injury in the ship's service may be entitled to maintenance for a period after he ceases to be on the ship. It is thought that because in this case, though their bodies are not shown to have been injured, they were bodily restrained by the Japanese, a hazard contemplated by the shipping articles, they come within the principle of cases allowing maintenance after they have ceased to serve the ship. No authority is cited for this and we do not think we are entitled so to extend the shipowner's general liability, in the absence of any proof that no maintenance was supplied the sailors during the detention and on their repatriation voyage.

It is further contended that because maintenance is part of the *compensation* to a sailor it is a part of his *wages* and because under the shipping articles here wages are agreed to be paid during internment and until repatriation, maintenance is due as an added part of the wage. We do not agree. Wages constituted one kind of the ship's obligation to the sailors. Maintenance is another kind. The distinction is drawn by the Supreme Court in The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, where the Court stated:

"That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, *at least,* so long as the voyage is continued." (Emphasis supplied.)

"That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, *whether the injuries were received by negligence or accident.*" (Emphasis supplied.)

■ The decree is affirmed as to the claim for maintenance. As to the claims of the several appellants for a war bonus it is reversed and the cause remanded for the entry of a decree for each appellant determining for each the amount of war bonus to which he is entitled pursuant to the above opinion, with interest at seven (7) per cent and for costs.